**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

JERRY BOYLE, on behalf of himself and a )
class of others similarly situated, )
                                         )
         Plaintiff, )
                                          )
        v. )
                                          )
CITY OF CHICAGO; Former Superintendent )
of the Chicago Police Department GARRY )
MCCARTHY; Former Superintendent of the )
Chicago Police Department JOHN )
ESCALANTE; Current Superintendent of the )
Chicago Police Department EDDIE )
JOHNSON; Former Chief of the Bureau of )
Organized Crime NICHOLAS ROTI; Current )
Chief of the Bureau of Organized Crime )
ANTHONY J. RICCIO; Bureau of Organized )      **JURY TRIAL DEMANDED**
Crime Technical Support Section Supervisors )
JACK COSTA and JAMES WASHBURN; )
unknown Chicago Police Department )
Supervisor JOHN DOES; and unknown )
Chicago Police Department Cell Site )
Simulator Operator JOHN DOES, )
                                          )
         Defendants. )

## INTRODUCTION

    1.    "Modern cell phones are not just another technological convenience. With

all they contain and all they may reveal, they hold for many Americans 'the privacies of

life.' The fact that technology now allows an individual to carry such information in his

hand does not make the information any less worthy of the protection for which the

Founders fought." *Riley v. California*, 134 S. Ct. 2473, 2494-95 (2014) (quoting *Boyd v.

United States*, 116 U.S. 616, 630 (1886)).

    2.    This is an action pursuant to 42 U.S.C. § 1983 and state law to challenge

the warrantless collection by the Chicago Police Department ("CPD") of personal, private

information from the cell phones of Chicago residents and visitors using "cell site simulators," also known colloquially as "stingrays."

3.    Cell site simulators are powerful technological devices that act as fake cell phone towers to surreptitiously obtain personal information from cell phones within their geographical range, which can extend more than a mile from the device. For example, cell site simulators have the power to obtain identifying information about cell phones, intercept phone calls or text messages made using the phone, reveal website browsing histories, and track a phone's cumulative movements.

4.    CPD owns and operates an arsenal of cell site simulators with these intrusive capabilities.

5.    Notwithstanding the potential of cell site simulators to intrude on the privacy and property of law-abiding citizens, CPD has maintained a practice of deploying them without a warrant. CPD has also refused to implement any written policies, procedures, guidelines or training to prevent the misuse of cell site simulators by CPD officers.

6.    Plaintiff Jerry Boyle is an attorney and longtime volunteer legal observer with the National Lawyers' Guild whose private cell phone was searched by a CPD cell site simulator at a January 15, 2015 political protest.

7.    Mr. Boyle brings this action on behalf of himself and a class of others similarly situated to seek redress for rights violations and to end Defendants' unlawful use of cell site simulators.

## JURISDICTION AND VENUE

8.    This action is brought pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201 et seq., and Illinois law to redress the Defendants' violations of Plaintiff's rights secured by the United States and Illinois Constitutions and state law.

9.    This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and § 1334 and supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

10.    Venue is proper under 28 U.S.C. § 1391(b). Plaintiff is located in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

11.    Plaintiff Jerry Boyle is an attorney, Chicago resident, and longtime volunteer legal observer with the National Lawyers Guild. Mr. Boyle's cell phone was searched using a cell site simulator by CPD officers during at least one political protest: a January 15, 2015 protest entitled Reclaim Martin Luther King Jr. Day.

12.    Defendant City of Chicago (the "City" or "Chicago") is a municipal corporation incorporated under the laws of the State of Illinois.

13.    Defendant Garry McCarthy was the Superintendent of CPD from May 16, 2011 until December 1, 2015. As Superintendent, McCarthy oversaw and approved of CPD's policies, practices, and customs with regard to cell site simulator surveillance and continued, facilitated, and maintained the unlawful use of cell site simulators by his subordinates. At all relevant times to this Complaint, Superintendent McCarthy acted under color of state law as a police officer of the City of Chicago and in the course and

within the scope of his employment. McCarthy is sued in his individual capacity for his direct participation in, supervisory liability for, and failure to intervene to prevent the unlawful use of cell site simulators on Mr. Boyle and all others similarly situated.

14. Defendant John Escalante served as the Interim Superintendent of CPD from December 2015 through March 2016. As Interim Superintendent, Escalante oversaw and approved of CPD's policies, practices, and customs with regard to cell site simulator surveillance and continued, facilitated, and maintained the unlawful use of cell site simulators by his subordinates. At all relevant times in this Complaint, Superintendent Escalante acted under color of state law as a police officer of the City of Chicago and in the course and within the scope of his employment. Defendant Escalante is sued in his individual capacity for his direct participation in, supervisory liability for, and failure to intervene to prevent the unlawful use of cell site simulators on the putative class.

15. Defendant Eddie Johnson is the Superintendent of CPD, having first undertaken that role in an interim capacity in March 2016. As Superintendent, Johnson has overseen and approved of CPD's policies, practices, and customs with regard to cell site simulator surveillance and has continued, facilitated, and maintained the unlawful use of cell site simulators by his subordinates. At all relevant times in this Complaint, Superintendent Johnson has acted under color of state law as a police officer of the City of Chicago and in the course and within the scope of his employment. Defendant Johnson is sued in his individual capacity for his direct participation in, supervisory liability for, and failure to intervene to prevent the unlawful use of cell site simulators on the putative class.

16.     Defendant Nicholas Roti is the former chief of CPD's Bureau of Organized Crime ("BOC"). As BOC chief, Defendant Roti was responsible for overseeing the acquisition and usage by CPD of cell site simulator technology and the policies, practices, and customs of the BOC with regard to cell site simulators. At all relevant times in this Complaint, Defendant Roti acted under color of state law as a police officer of the City of Chicago and in the course and within the scope of his employment. Defendant Roti is sued in his individual capacity for his direct participation in, supervisory liability for, and/or failure to intervene to prevent the use of cell site simulators on Mr. Boyle and all others similarly situated.

17.     Defendant Anthony J. Riccio is the current chief of the BOC, having assumed that role in approximately March 2015. As the BOC chief, Defendant Riccio has been responsible for overseeing the acquisition and usage by CPD of cell site simulator technology and the policies, practices, and customs of the BOC with regard to cell site simulators. At all relevant times in this Complaint, Defendant Riccio has acted under color of state law as a police officer of the City of Chicago and in the course and within the scope of his employment. Defendant Riccio is sued in his individual capacity for his direct participation in, supervisory liability for, and failure to intervene to prevent the use of cell site simulators on the putative class.

18.     Defendant Jack Costa is the supervising sergeant for the Electronic and Technical Support Section of CPD's Bureau of Organized Crime, commonly referred to as the "Tech Lab." The Tech Lab is responsible for maintaining CPD's electronic surveillance tools, including cell site simulator equipment and all of the electronic surveillance equipment used by various divisions within the Bureau of Organized Crime.

As part of that responsibility, the Tech Lab maintains copies of pen register orders issued for the use of cell site simulator equipment by CPD. As the head of CPD's Tech Lab, Costa is responsible for the uses and practices of CPD in employing various technologies, including cell site simulators. At all relevant times in this Complaint, Costa has acted under color of state law as a police officer of the City of Chicago and in the course and within the scope of his employment. Costa is sued in his individual capacity for his direct participation in, supervisory liability for, and failure to intervene to prevent the use of cell site simulators on Mr. Boyle and all others similarly situated.

19. Defendant James Washburn is a sergeant in CPD's Bureau of Organized Crime and a supervisor in the Technology Lab of the CPD Bureau of Organized Crime with responsibility for overseeing the acquisition and usage by CPD of cell site simulator technology. Defendant Washburn is involved in both the purchase and use of cell site simulator technology by CPD. At all relevant times in this Complaint, Washburn has acted under color of state law as a police officer of the City of Chicago and in the course and within the scope of his employment. Washburn is sued in his individual capacity for his direct participation in, supervisory liability for, and failure to intervene to prevent the use of cell site simulators on Mr. Boyle and all others similarly situated.

20. Defendant John Doe Supervisors are unknown supervisors in CPD, the BOC, and CPD's Crime Prevention and Information Center, with responsibility for overseeing CPD's policies, practices, and customs relating to cell site simulators. Defendant John Doe Supervisors specifically include but are not limited to the unknown supervisor(s) in the Gang Investigations Division of the BOC who took over the responsibilities of former CPD commander Joseph Gorman in procuring cell site

simulators and approving their purchase and use, and all CPD officers who served as Tech Lab supervisors between January 12, 2015, and January 12, 2017.

21. At all relevant times in this Complaint, Defendant John Doe Supervisors acted under color of state law as police officers of the City of Chicago and in the course and within the scope of their employment. Defendant John Doe Supervisors are sued in their individual capacities for their direct participation in, supervisory liability for, and failure to intervene to prevent the use of cell site simulators on Mr. Boyle and all others similarly situated.

22. Collectively, Defendants Garry McCarthy, John Escalante, Eddie Johnson, Nicholas Roti, Anthony J. Riccio, James Washburn, Jack Costa, and the other unknown Defendant John Doe Supervisors are referred to as the "Defendant Supervisors."

23. Defendant John Doe Cell Site Simulator Operators are unknown CPD officers who operated a cell site simulator device to search the cell phones of Mr. Boyle and other members of the putative class. At all relevant times in this Complaint, the Defendant John Doe Cell Site Simulator Operators acted under color of state law as police officers of the City of Chicago and in the course and within the scope of their employment. Defendant John Doe Cell Site Simulator Operators are sued in their individual capacities.

24. Collectively, the Defendant Supervisors and the Defendant Cell Site Simulator Operators are referred to as the "Individual Defendants."

## FACTUAL ALLEGATIONS

### Cell Site Simulators

25.     A cell site simulator is a technological device that impersonates the cellular towers used by wireless companies and forces all cell phones within its range to transmit information to the device – and thus, to the police – without the knowledge or consent of the phone's owner.

26.     Acting in this manner, cell site simulators access the unique subscriber identification number and/or electronic serial number associated with each cell phone, which, in turn, can be used to identify the cell phone user and his or her location.

27.     In addition to identifying cell phone users, cell site simulators have other extraordinary capabilities.

28.     Cell site simulators can access the content of phone calls made on a cell phone.

29.     Cell site simulators can access information in call logs, such as the duration, timing, and phone numbers of incoming and outgoing calls.

30.     Cell site simulators can obtain text messages sent to and from a cell phone.

31.     Cell site simulators can access a cell phone's Internet browsing history, showing websites accessed on the phone.

32.     Cell site simulators can obtain information about the location of a cell phone, pinpointing its location with such accuracy that the device can reveal whether the cell phone user is inside a particular house or apartment.

33.     Cell site simulators can even track a cell phone user's location over time, thus revealing the cell phone user's cumulative movements to law enforcement.

34.     Cell site simulators do not operate against only a target phone; instead, they often force all cell phones within their geographical range, which can extend more than a mile from the device, to transmit personal data to the police. Accordingly, even when police are using the device to target a specific individual, the cell site simulator trespasses upon, accesses, and impacts the cell phones of a large number of bystanders.

35.     When a cell site simulator is active in a particular geographic area, it drains cell phone batteries, disrupts legitimate cell phone service, and often forcibly redirects cell phones to a lower quality network, leading to dropped calls and reduced or eliminated service.

36.     Cell site simulators are commonly referred to as "stingrays" based on a popular model of cell site simulator sold by leading manufacturer Harris Corporation. They are also known as "IMSI-catchers" because of their ability to capture the unique "international mobile subscriber identity" associated with each cell phone.

### CPD's Secretive and Widespread Use of Cell Site Simulators

37.     CPD has a practice of deploying cell site simulators to seize and search personal data from the cell phones of Chicago residents and visitors without a warrant or probable cause.

38.     CPD's use of cell site simulators is secretive and widespread.

39.     CPD has long refused to disclose information about its use of cell site simulators to the public and fought attempts to obtain such records in the courts, choosing to conceal its use of the technology. *See, e.g.*, Chicago Tribune, Jason Meisner, *Judge to Review Police Records on Secret Stingray Cellphone Tracking System*, Jan. 11, 2016.

40.     Until recently, CPD would not even confirm that it possessed cell site simulator technology. *Id.*

41.     In 2014, following an adverse court decision, CPD turned over purchasing documents related to cell site simulators in response to an Illinois Freedom of Information Act ("FOIA") request. *Martinez v. Chicago Police Department*, Case No. 14 CH 9565 (Ill. Circ. Ct. of Cook Cnty.) ("*Martinez I*").

42.     In October 2016, again following an adverse court decision, CPD provided further documents regarding its use of cell site simulators in the FOIA case of *Martinez v. Chicago Police Department*, Case No. 14 CH 15338 (Ill Cir. Ct. of Cook Cnty.) ("*Martinez II*").

43.     Invoices from the FOIA cases reveal that CPD spent well over half a million dollars between 2005 to 2010 alone on cell site simulators, software upgrades, and other related products. Defendant Washburn, former BOC Gang Divisions Commander Joseph Gorman, and unknown Defendant Supervisors arranged the purchases for CPD.

44.     The FOIA documents further revealed that CPD's cell site simulators included the Harris Corporation's StingRay, Triggerfish, KingFish, and AmberJack devices.

45.     The StingRay is a cell site simulator that has the capacity to access communications content from cell phones.

46.     The Triggerfish is an eavesdropping device that enables its users to listen in on cell phone conversations in real time and can gather information on as many as 60,000 different phones at a time.

47. The KingFish facilitates the tracking and mining of information from cell phones in a target area.

48. The AmberJack is an antenna that helps hone in on the location of a particular cell phone.

49. Documents from the FOIA cases confirm that cell site simulators, including the Triggerfish eavesdropping device, are being used and operated by the Technical Service Unit of CPD's Bureau of Organized Crime to obtain personal information from the private cell phones of Chicago residents and visitors.

50. Despite the power of cell site simulators to invade the privacy and property of Chicago residents and visitors, CPD does not maintain any written policies, practices, or standards of any kind regarding the use of cell site simulators.

51. CPD likewise maintains no written policies, procedures, or practices:

   a. restricting the circumstances in which cell site simulators may be used;

   b. restricting the manner in which cell site simulators may be used;

   c. restricting the use of Stingrays or TriggerFish devices to access communications made on private cell phones;

   d. restricting the use of cell site simulators to access the cell phones of non-suspect bystanders during criminal investigations;

   e. restricting the use of cell site simulators during political protests;

   f. requiring any authorization for the use of cell site simulators or any of their particular capabilities;

   g. restricting the kinds of employees authorized to use cell site simulators;

   h. setting forth procedures for signing cell site simulator devices in and out from the locations at which they are stored;

   i. imposing documentation or record-keeping requirements of any kind in connection with cell site simulator use; and/or,

   j. storing and/or deleting data obtained from the cell phones of criminal suspects and/or non-suspect bystanders.

52. The City does not even maintain any policies or procedures on what its officers may do with the personal information seized from thousands of individual cell phones without a warrant.

53. The City has also, as a matter of practice, refused to train its officers about constitutional issues associated with officers' use of cell site simulators.

54. In addition, the City has maintained a widespread practice of permitting its police officers to deploy cell site simulators without a warrant specific to each phone that is searched in the process, and has frequently failed to obtain warrants even for the phone of the target in question.

55. In the instances in which the City has actually sought judicial approval to deploy cell site simulators, the City's standard practice has been to seek pen register orders, or "trap and trace" orders, instead of warrants based on individualized probable cause.

**Named Plaintiff Jerry Boyle's Allegations**

56. On January 15, 2015, Chicago-based organizations, activists, and community members held a political protest and march, entitled Reclaim MLK Day, on the West Side of Chicago.

57. Hundreds of Chicago residents attended the Reclaim MLK Day gathering to call attention to issues including police shootings of black youth and adults.

58. Plaintiff Jerry Boyle, an attorney and longtime volunteer legal observer with the National Lawyers Guild, attended the protest to observe CPD's treatment of protesters and provide pro bono legal assistance to any protesters who needed it.

59. Mr. Boyle routinely attends protests to monitor police activity during the protests, gather information, and engage in legal advocacy on behalf of protesters, and plans to continue to do so in the future.

60. At approximately 8:00pm at the protest, near the 2200 block of West Ogden Avenue, one or more Defendant Cell Site Operators used a cell site simulator to search the private cell phones of Mr. Boyle and nearby protesters, bystanders, and Chicago residents.

61. The Defendants deployed the cell site simulator in the immediate vicinity of private homes, private offices, juvenile courts, medical facilities, and at least one church, as well as protesters engaging in protected political speech.

62. The Defendants did not have a warrant or probable cause to search and seize the private cell phones of Mr. Boyle or any other member of the public.

63. No exigent circumstance occurred during the protest that would have justified a search of the cell phones of Mr. Boyle or any other member of the public at the protest.

64. The Defendant Cell Site Simulator Operators acted pursuant to the established policy and practice of Defendant City of Chicago, as is set forth in more detail in paragraphs including 37-55 and 83-108.

65. The Defendant Cell Site Simulator Operators obtained information from the private cell phones of Chicago residents and visitors with the direct participation,

knowledge, approval, and ratification of the Defendant Supervisors, as is set forth in more detail in paragraphs including 109-113.

66.     Each of the Defendant Cell Site Simulator Operators acted or failed to act knowingly and intentionally, maliciously, wantonly, or with reckless or callous disregard for, or indifference to, the rights of Mr. Boyle and all others similarly situated.

## Class Action Allegations

67.     Named Plaintiff Jerry Boyle pursues this action on behalf of himself and a class of others similarly situated (the "Class") pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of Federal Rules of Civil Procedure.

68.     Plaintiff believes the class should be organized as follows:

69.     Class I consists of all persons whose cell phones were searched or seized without a warrant using cell site simulators by CPD at any time between January 12, 2015 and the present day, in violation of the Fourth Amendment of the United States Constitution.

70.     Subclass A consists of: all members of Class I who were targeted by CPD's cell site simulator technology as a result of their attendance at a political protest.

71.     Class I, and Subclass A, seek both damages and injunctive relief.

72.     The individuals in Class I and Subclass A are so numerous that joinder of all members is impractical. Upon information and belief, CPD illegally uses cell site simulators to command cell phones belonging to thousands of Chicago residents and visitors each year to reveal personal information to the Police without a warrant or probable cause.

73. Discovery will reveal information that identifies the phones searched by Defendants using cell site simulators, or alternatively, information sufficient to identify the dates, times, and geographical range in which the Defendants deployed cell site simulators.

74. Plaintiff's claims arise from a common set of municipal practices, and thus questions of law and fact common to Class I exist. These common questions include, but are not limited to:

a. Whether Defendant City of Chicago maintains a practice of deploying cell site simulators to commandeer and search class members' cell phones without a warrant or probable cause;

b. Whether Defendants' use of cell site simulators to commandeer and search class members' cell phones constitutes a search or seizure pursuant to the Fourth Amendment of the United States Constitution;

c. Whether Defendants' use of cell site simulators to commandeer and search class members' cell phones without a warrant or probable cause violates the Fourth Amendment;

d. Whether Defendants' search or seizure of class members' cell phones under the limited authority conferred by pen register and trap and trace orders violates the Fourth Amendment;

e. Whether Defendants' use of cell site simulators violates class members' rights under Illinois law;

f. Whether the Defendant City's policies, practices, and customs were the moving force behind the violations of class members' constitutional rights;

g. Whether the Defendant Supervisors directly participated in, approved of, condoned, ratified, instituted, and/or were deliberately indifferent to the risk of the violations of the class members' rights;

h. Whether there is a cognizable danger that class members will be subject to recurring violations of their constitutional rights.

75.     Likewise, the First Amendment claims of Subclass A arise from a common set of municipal practices, and thus questions of law and fact common to Subclass A exist in addition to those common to Class I at large. These common questions include, but are not limited to:

a.     Whether Defendant City of Chicago deploys cell site simulator technology at political protests against law-abiding protesters and bystanders;

b.     Whether Defendants selectively target certain kinds of speech with the use of cell site simulators;

c.     Whether Defendants searched and seized personal information from the private cell phones of subclass A members using cell site simulators because of class members' protest, speech, or political associations;

d.     Whether Defendants' deployment of cell site simulators is motivated by class members' speech or political activity;

e.     Whether Defendants' actions have interfered with Subclass A members' exercise of their First Amendment rights;

f.     Whether Defendants' use of cell site simulators violates class members' rights under the First Amendment and Illinois law;

g.     Whether Defendant City of Chicago's policies, practices, and customs are the moving force behind the violations of class members' constitutional rights;

h.     Whether there is a cognizable danger that Subclass A members will be subject to recurring violations of their constitutional rights.

76.     The claims of Named Plaintiff Jerry Boyle are typical of the claims of the entire class, because each member of the class was, and in the future will be, subject to Defendants' common course of unconstitutional practices with respect to its deployment of cell site simulators to search and seize personal information.

77.     Plaintiff Boyle will represent the interests of Class I and Subclass A fairly and adequately and has no interests antagonistic to other members of the class.

78.     Plaintiff Boyle has retained skilled counsel with experience in class action, constitutional, and civil rights litigation.

79.     Questions of law and fact common to the members of the class predominate over any questions affecting only individual members.

80.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

81.     Particular issues exist that are appropriate for resolution on a class basis.

82.     The Defendants have acted on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to Class I and Subclass A as a whole.

### The City's Unconstitutional Policies and Practices

83.     The Defendants' misconduct was undertaken pursuant to the policy and practice of Defendant City of Chicago.

84.     First, the City maintains the affirmative practice of using cell site simulators to trespass upon, search, and seize personal information from the cell phones of class members without a warrant or probable cause.

85.     Second, the City directly encourages, and is thereby the moving force behind, the unconstitutional use of cell site simulators at issue here by making an affirmative, official decision not to promulgate any policy, procedure, or guideline that addresses the permissible or constitutional use of cell site simulator equipment to guide or restrict the Individual Defendants' use of cell site simulators, as well as by failing to

impose any requirements that CPD officers using cell site simulators obtain written authorization from a supervisor prior to or after using the devices, or even document their use of the devices in any way.

86.     The City's decision not to promulgate *any* written policies, procedures, or guidelines governing the use of cell site simulators to protect the constitutional rights of Plaintiff Boyle and the class reflects deliberate indifference.

87.     Third, as a matter of policy and practice, the City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train and supervise the Defendant Cell Site Simulator Operators regarding the permissible and constitutional use of cell site simulators on Chicago residents and visitors, such that its failure to do so manifests deliberate indifference.

88.     Indeed, the City offers no training and supervision of any kind to CPD officers regarding the permissible and constitutional use of cell site simulators.

89.     The City has refused to implement written policies, procedures, guidelines or training about the use of cell site simulators, even though:

        a.      The City had actual and/or constructive notice that the Individual Defendants' standardless use of cell site simulators would result in widespread constitutional rights violations;

        b.      The City had actual and/or constructive notice that the adoption of written policies, procedures, guidelines, and training restricting the use of cell site simulators was necessary to avoid a substantial risk of constitutional violations; and,

        c.      The standardless use of cell site simulators by the Individual Defendants created an obvious risk of constitutional violations, both because of the

power of cell site simulator technology and because of the inability of the public and media to detect its use and thus report abuses.

90.     Fourth, as a matter of policy and practice, the City also facilitates the very type of misconduct at issue here by failing to adequately review and discipline instances in which cell site simulators are unlawfully used on Chicago residents and visitors, thereby leading the Defendant Cell Site Simulator Operators to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff and those similarly situated. CPD officers engaging in the unlawful use of cell site simulators can be confident that their misconduct will not be investigated in earnest by the City, and that the City will decline to impose discipline even when officers have unlawfully used a cell site simulator.

91.     On information and belief, despite officers' widespread abuse of cell site simulators in manners similar to that alleged by Mr. Boyle in this Complaint, the City has never disciplined a Chicago police officer for his or her unlawful use of a cell site simulator against a Chicago resident or visitor.

92.     Fifth, the City directly encourages, and is thereby the moving force behind, the unconstitutional use of cell site simulators by maintaining a policy, practice, or custom, pursuant to which CPD officers present misleading applications for pen register and trap and trace orders to courts, that, in reality, seek authorization for the use of cell site simulators. The purpose of this policy, practice, and custom is to evade judicial scrutiny and the constitutional requirement of a warrant based on probable cause.

93.     Sixth, Defendant City of Chicago also has an official policy and/or widespread practice of using cell site simulators to illegally obtain information from the

cell phones of law-abiding individuals and organizations engaged in First Amendment-protected speech, association, and assembly.

94.     Pursuant to this policy and practice, the Defendant Cell Site Simulator Operators, in conjunction with the Defendant Supervisors, target law-abiding individuals and organizations engaged in political activities and associations for illegal surveillance using cell site simulators.

95.     CPD has a decades-long history of targeting individuals and organizations for illegal surveillance because of their political activities. For example, "[f]rom the 1920s to the 1970s the intelligence division of the Chicago Police Department contained a unit nicknamed the 'Red Squad' which spied on, infiltrated, and harassed a wide variety of political groups that included but were not limited to left- and right-wing extremists. Most of the groups, including most of the politically extreme groups, were not only lawful, and engaged in expressive activities protected by the First Amendment, but also harmless." *Am. Civil Liberties Union of Illinois v. City of Chicago*, No. 75 C 3295, 2008 WL 4450304, at *1 (N.D. Ill. Sept. 30, 2008) (quoting *Alliance to End Repression v. City of Chicago*, 237 F.3d 799, 801 (7th Cir. 2001)).

96.     Due to this illegal surveillance, CPD was under a consent decree governing its activities investigating protesters for nearly three decades. *See id.*

97.     "First Amendment worksheets" obtained pursuant to FOIA confirm that CPD continues to conduct intelligence operations into political groups, including groups protesting police misconduct.

98.     Pursuant to CPD rules, prior to undertaking such a First Amendment investigation, police are required to outline the scope and need for the investigation in a

"First Amendment worksheet" and obtain approval from CPD's general counsel. *See* Chicago Police Department Special Order S02-02-01, Investigations Directed at First Amendment-Related Information.

99.     In the wake of the August 2014 police shooting of Michael Brown in Ferguson, Mississippi, which sparked protests critical of the police across the nation, CPD began tracking demonstrators in Chicago and obtaining information about them without authorization. *See* Mick Dumke, Chicago Sun Times, *Undercover Cops, Rahm Aides Kept Tabs on Protesters*, April 9, 2016.

100.     It was not until nearly three months later, on November 7, 2014, that CPD supervisors finally submitted "First Amendment worksheets" for approval of investigations into post-Ferguson police protests. *Id.* The worksheets permitted surveillance of organizations including Black Youth Project 100, Southsiders Organized for Unity, Funders for Justice, and Workers Center for Racial Justice, without any documented reason for targeting those particular groups.

101.     Over the next two months, CPD Commander Steven Caluris sought and received authorization to expand the investigation to collect Internet data on dozens of other protest leaders and social media groups. *Id.*

102.     Consistent with its history of illegal surveillance of political protesters, CPD has employed cell site simulators against political protesters, without a warrant or probable cause to suspect wrongdoing.

103.     The Defendants used cell site simulators on Plaintiff Boyle in January 2015 pursuant to CPD's standard practice of spying on political protestors.

21

104.     Finally, the constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the City of Chicago in that they were committed with the knowledge, approval, and/or ratification of persons with final policymaking authority for Chicago and CPD, or were committed by persons with such final policymaking authority.

105.     Specifically, Chicago's final policymakers with respect to functions of CPD and the BOC and Tech Lab were Defendants McCarthy, Escalante, Johnson, Roti, and/or Riccio.

106.     These final policymakers ratified and authorized the illegal use of cell site simulators, as well as the use of cell cite simulators without any written policies or standards, training, supervision, oversight, or monitoring.

107.     The ratification and authorization of this misconduct by these final policymakers constituted the official policy of the City of Chicago, and the final policymakers were deliberately indifferent to the risk that these policies, practices, and customs would lead to the violation of citizens' constitutional rights.

108.     The policies, practices, and customs set forth above were the moving force behind the violations of the constitutional rights of the members of Class I and Subclass A, and directly and proximately caused Plaintiff Boyle and all those similarly situated to suffer injury, including invasions of their privacy and property.

**The Defendant Supervisors' Misconduct**

109.     The Defendant Supervisors directly participated in, knew of, approved of, and ratified the warrantless use of cell site simulators in violation of the rights of Plaintiff Boyle and the class.

22

110.     The Defendant Supervisors, at all times material to this Complaint, had promulgated, and/or were aware that the City had promulgated and maintained the above-described policies, practices, and customs regarding cell site simulators, the maintenance of which would cause preventable constitutional violations.

111.     The Defendant Supervisors oversaw, endorsed, condoned, and acquiesced in the above-mentioned policies, practices, and customs, and refused to take steps to correct them, turning a blind eye to repeated and systemic violations of constitutional rights of citizens, including Plaintiff Boyle and the class.

112.     The Defendant Supervisors were, at all times material to the Complaint, deliberately indifferent to the rights of Plaintiff Boyle and class members, as evidenced by their acquiescence to and support of these policies and their obvious consequences.

113.     Each of the Defendant Supervisors acted or failed to act knowingly, intentionally, maliciously, wantonly, and/or with reckless or callous disregard or indifference to the rights of Plaintiff Boyle and class members.

## CLAIMS

### Count I – 42 U.S.C. § 1983
### Fourth Amendment Unlawful Search and Seizure
### Against the Individual Defendants and Defendant City of Chicago

114.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

115.     Defendant City of Chicago and the Individual Defendants violated, and continue to violate, the rights of Plaintiff Boyle and all Class I members to be free from unreasonable search and seizure pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

116.     Defendants' actions have been intentional and willful and exhibit a conscious disregard or reckless indifference to the rights of Plaintiff Boyle and all others similarly situated.

117.     The misconduct described in this Count has been undertaken pursuant to the custom, policy, and/or practice of Defendant City of Chicago, such that Defendant City is liable, as described above in paragraphs including 37-55 and 83-108.

118.     As a result of the Individual Defendants' misconduct described in this Count, undertaken pursuant to the City's policy and practice, Plaintiff and all others similarly situated have suffered injury, including invasions of their privacy and property.

119.     Plaintiff and the class he represents have no adequate remedy at law and will suffer irreparable harm if an injunction is not entered against Defendants from their ongoing violations of the rights of Plaintiff and the class to be free from unlawful searches and seizures of their property. The balance of harms between the parties favors entering injunctive relief and an injunction in this case would serve the public interest.

**Count II – 42 U.S.C. § 1983**
**First Amendment**
**Against Defendant City of Chicago and the Individual Defendants**

120.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

121.     Defendant City of Chicago and the Individual Defendants violated, and continue to violate, the rights of Plaintiff and all members of Subclass A to free speech, assembly, and association as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

24

122.    Plaintiff and Subclass A members attended and participated in lawful political protests, and intend to participate in lawful political protests in the future.

123.    Attendance and participation in lawful political protests is behavior protected by the First Amendment.

124.    Defendants, through their use of cell site simulators, trespassed upon and obtained personal information from the private cell phones of Plaintiff and Subclass A members.

125.    Defendants' decision to use a cell site simulator was motivated by the lawful assembly, association, and participation in political protests of Plaintiff and Subclass A members.

126.    Defendants' use of cell site simulators against Plaintiff and Subclass A members inhibits core First Amendment expression in ways that include interfering with lawful communications and invading the property and privacy of individuals engaged in protests.

127.    As a result of Defendants' misconduct described in this Count, undertaken pursuant to the City's policy and practice, Plaintiff and Subclass A members have suffered injury, including curtailment of their right to engage in free speech, assembly, and association.

128.    Defendants' actions were intentional, willful, and exhibited a conscious disregard or reckless indifference to the rights of Plaintiff and all others similarly situated.

129.     Unless Defendants are enjoined, they will continue to violate the First Amendment rights of Plaintiff and Subclass A to lawfully assemble and associate, engage in political protest, and exercise their right of free speech.

130.     Plaintiff Boyle fears that his cell phone will be illegally accessed during future protests in Chicago at which he serves as a legal observer.  Unless Defendants are enjoined, Plaintiff Boyle will be chilled from exercising his First Amendment rights during protests.

131.     Plaintiff and Subclass A have no adequate remedy at law and will suffer irreparable harm if an injunction is not entered against the Defendants from violating their First Amendment rights. The balance of harms between the parties favors entering injunctive relief and an injunction in this case would serve the public interest.

**Count III – 42 U.S.C. § 1983**
**Failure to Intervene**
**Against the Individual Defendants**

132.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

133.     As described more fully above, one or more Individual Defendants had a reasonable opportunity to prevent the violation of the constitutional rights of all Class I and/or Subclass A members who were subjected to the unconstitutional use of cell site simulators, had they been so inclined. They failed to do so.

134.     The Individual Defendants' actions were undertaken intentionally, with malice, and/or with reckless indifference to the rights of Plaintiff and all Class I and/or Subclass A members.

135.   As a direct and proximate result of Individual Defendants' misconduct, the rights of Plaintiff and all Class I and/or Subclass A members were violated and they suffered injuries including invasions of their privacy and property.

136.   These injuries were caused by CPD employees, including but not limited to the named Individual Defendants, who acted pursuant to the policies and practices of the City of Chicago.

### Count IV – 42 U.S.C. § 1983
### Conspiracy
### Against all Individual Defendants

137.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

138.   The Individual Defendants, acting together and under color of law, reached an agreement among themselves to deprive Plaintiff and the class members of their constitutional rights and to protect one another from liability for depriving Plaintiff and all Class I and/or Subclass A members of their constitutional rights, all as described in the various paragraphs of this Complaint.

139.   In furtherance of this conspiracy, each of the co-conspirators was a willful participant in joint activity and committed overt acts including but not limited to the purchase and procurement of cell site simulators, the affirmative decision and agreement not to issue any policies, procedures, guidelines, or training to limit misuse of the technology, the affirmative decision and agreement to use cell site simulators without first obtaining a warrant, and/or the use of the technology in an unconstitutional manner.

140. The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to the rights of Plaintiff and all Class I and/or Subclass A members.

141. As a direct and proximate result of the illicit prior agreement referenced above, the rights of Plaintiff and all Class I and/or Subclass A members were violated and they suffered injuries including invasions of their privacy and property.

**Count V – State Law Claim
Article I, Section 6 of the Illinois Constitution
Against Defendant City of Chicago and the Individual Defendants**

142. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

143. Defendants violated the rights of Plaintiff and all Class I and/or Subclass A members to be free of unreasonable searches and invasions of communications as guaranteed by Article 1, Section 6 of the Illinois Constitution.

144. Defendants' actions were intentional, willful, and exhibited a conscious disregard or reckless indifference to the rights of Plaintiff and all Class I and/or Subclass A members.

145. The misconduct described in this Count was undertaken pursuant to the custom, policy, and/or practice of Defendant City of Chicago, such that Defendant City of Chicago is liable, as described above in paragraphs including 37-55 and 83-108.

146. As a result of the Individual Defendants' misconduct described in this Count, undertaken pursuant to the City's policy and practice, Plaintiff and all Class I and/or Subclass A members have suffered injury, including invasions of their privacy and property.

**Count VI – State Law Claim**
**Tort of Invasion of Privacy**
**Against Defendant City of Chicago and the Individual Defendants**

147.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

148.    Defendants' use of cell site simulators intruded upon the privacy of Plaintiff and all others similarly situated without their authorization.

149.    Defendants' intrusive use of cell site simulators was offensive and objectionable to a reasonable person.

150.    Defendants' intrusive use of cell site simulators caused Plaintiff and all others similarly situated injury, including invasions of their privacy and property.

**Count VII – State Law Claim**
**Respondeat Superior**
**Against Defendant City of Chicago**

151.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152.    In committing the acts alleged in the preceding paragraphs, the Individual Defendants were all members and agents of CPD acting at all relevant times within the scope of their employment.

153.    Defendant City of Chicago is liable as principal for all state law torts committed by its agents.

**Count VIII – State Law Claim**
**Indemnification**
**Against Defendant City of Chicago**

154.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

155.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

156.    The Individual Defendants are or were employees of CPD who acted within the scope of their employment in committing the misconduct described above.

## CLASS PRAYER FOR RELIEF

Plaintiff Jerry Boyle, on behalf of himself and the Class I and Subclass A, prays for the following relief:

- The entry of an order certifying this cause as a class action pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

- A declaratory judgment that Defendants have violated the Fourth and Fourteenth Amendments to the United States Constitution by depriving Plaintiff and the members of Class I of their right to be secure in their person and effects.

- A declaratory judgment that Defendants have violated the First and Fourteenth Amendments to the United States Constitution by depriving Plaintiff and the members of Subclass A of their right to free speech, assembly, and association.

- A permanent injunction in favor of the plaintiff class directing the Defendants City of Chicago, Eddie Johnson, and Anthony Riccio to immediately desist from their unlawful policies, practices, and customs concerning the use of cell site simulators.

- Judgment against each Defendant, jointly and severally, for actual compensatory damages to class members.

- Punitive damages against the Individual Defendants in an amount sufficient to deter them from continuing to violate the rights of the class.

- An award of costs and attorney's fees.

- Such further and additional relief as this court may deem just and proper.

## INDIVIDUAL PRAYER FOR RELIEF

Plaintiff Jerry Boyle individually prays for the following relief:

- Injunctive relief to permanently restrain Defendants City of Chicago, Eddie Johnson, and Anthony Riccio from unlawfully trespassing upon, seizing, and searching personal information in his cell phone in the future.

- Judgment against each Defendant, jointly and severally, for actual individual compensatory damages.

- Punitive damages against the Individual Defendants in an amount sufficient to deter them from continuing to violate the rights of Mr. Boyle and others.

- An award of costs and attorney's fees.

- Such further and additional relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff Boyle respectfully demands a trial by jury on behalf of himself and all those similarly situated, on all issues so triable.

Dated: January 12, 2017

Respectfully submitted,

**JERRY BOYLE**

BY: /s/ Matthew Topic
 *One of Plaintiff's Attorneys*

Michael Kanovitz
Matthew Topic
Ruth Brown
Josh Burday
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900

Craig B. Futterman
EDWIN F. MANDEL LEGAL AID CLINIC
University of Chicago Law School
6020 S. University
Chicago, Illinois 60637
(773) 702-9611

## CERTIFICATE OF SERVICE

I, Matthew Topic, an attorney, certify that on January 12, 2017, the foregoing was served via the Court's electronic filing system upon all counsel of record.

<u>/s/ Matthew Topic</u>